**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | | |
|---|---|---|
| Katie Preusser | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 16 CV 50288 |
| | ) | Magistrate Judge Iain D. Johnston |
| Nancy A. Berryhill, Acting | ) | |
| Commissioner of Social Security, [1] | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

In July 2013, Katie Preusser filed applications for disability benefits. She was 33 years old with two teenage children. Beginning in 1999, she worked for seven years as a desk clerk and laundry aid at a motel and then worked the next five years as a laundry aid in a nursing facility. In May 2012, she quit the latter job so that she could move to Iowa to be with a new boyfriend and also because she felt that her health ailments made it too hard to keep working. In her disability applications, she listed her ailments as fibromyalgia, carpal tunnel, anxiety disorder, dyslexia, and depression.

On March 2, 2016, the administrative law judge ("ALJ") issued a decision finding that plaintiff was not disabled. The ALJ concluded that plaintiff did not have fibromyalgia as she claimed and that her various symptoms—back pain, migraines, sleep problems, mental problems (among others)—were caused by other conditions and that they did not prevent her from doing light work. The ALJ concluded that plaintiff's allegations were not credible because she only sought routine treatment; the objective clinical findings were unremarkable; doctors encouraged her to exercise; she did not take narcotics; and she engaged in a wide variety of activities.

---

[1] Nancy A. Berryhill has been substituted for Carolyn W. Colvin. Fed. R. Civ. P. 25(d).

Plaintiff argues that the case should be remanded for multiple reasons. Her main argument—and one that warrants a remand—is that the ALJ erred in summarily concluding, without relying on any medical opinion, that plaintiff's doctors were wrong in diagnosing her with fibromyalgia. The Court begins with, and will focus mostly on, this argument. It includes several general criticisms—cherry-picking and doctor playing—that are applicable to plaintiff's remaining arguments, which will be addressed more briefly at the end of this opinion.

At Step Two in the five-step analysis, the ALJ considered which alleged ailments qualified as severe impairments. Although the ALJ found that a number of these were severe—specifically, degenerative disc disease, osteoarthritis, anxiety disorder, personality disorder, and carpal tunnel syndrome—the ALJ found that plaintiff's fibromyalgia was not one of them. In fact, the ALJ concluded that it was not even a medically determinable impairment, which meant that the ALJ did not even reach the severity question. Plaintiff argues that the ALJ's analysis was insufficient.

Before discussing the ALJ's specific analysis, it should be noted that the key piece of evidence plaintiff now relies on to support her fibromyalgia argument is five pages of treatment notes from her visit to Dr. Petar Lenert on August 8, 2012. *See* R. 598-603. Dr. Lenert was a rheumatologist at the University of Iowa Hospitals where plaintiff's primary care physician referred her for a consultation about fibromyalgia. Dr. Lenert reviewed plaintiff's medical history and examined her and concluded that her multiple symptoms were consistent with fibromyalgia. However, despite the seeming importance of this evidence, the ALJ glossed over it.

The ALJ's analysis of plaintiff's fibromyalgia consisted of the following paragraph:

The claimant reported fibromyalgia and the treatment record documents Fibromyalgia with Cymbalta prescribed (Exhibits 4E; 3F). I considered the claimant's allegations of fibromyalgia and SSR 12-2p when evaluating this case. However, the medical evidence and treatment record do not support tender point findings to support this diagnosis. Also, there are other severe medical conditions as enumerated above that are documented and supported by diagnostic testing that explain her pain. Accordingly, I do not find a

2

medically determinable impairment of fibromyalgia. However, I have considered her reported pain complaints throughout her body in assessing the residual functional capacity.

R. 38.

A few preliminary observations can be noted. First, this paragraph does not specifically refer to Dr. Lenert's August 8, 2012 diagnosis. However, it states that "the treatment record documents Fibromyalgia" and then cites Exhibit 3F, which is a 72-page exhibit containing the 5 pages of Dr. Lenert's notes. Based on these references, the ALJ appears to be vaguely alluding to Dr. Lenert's diagnosis, although this point is not clear based solely on reading this paragraph.[2] Not only did the ALJ omit any specific reference to Dr. Lenert's diagnosis, the ALJ generally did not refer to or discuss specific evidence in this paragraph. Second, this relatively short paragraph contains the only reference to fibromyalgia in the entire 18-page decision. It is surprising that the ALJ devoted so little attention to this ailment. Plaintiff's fibromyalgia was not a peripheral part of her case. Indeed, it was identified as her primary impairment. R. 124. At the administrative hearing, her attorney identified it first in the list of problems, referring to a "long standing" diagnosis. Fibromyalgia is also a recurrent issue in Social Security disability cases. To be sure, as many have noted, it is hard to diagnose, but this is not a reason to engage in a summary analysis—in fact, it suggests greater care is warranted.

Despite its brevity and lack of detail, this paragraph still contains a few clues about the ALJ's reasoning. However, these clues suggest that the ALJ relied on an outdated legal standard. The ALJ cited to Social Security Regulation 12-2p ("Evaluation of Fibromyalgia") and then stated that there were no "tender point findings." This is the only substantive analysis. Based on the ALJ's statements, the Court infers that the ALJ believed that SSR 12-2p required that there be tender point findings. However, as plaintiff correctly points out, this is not true. SSR 12-2p was issued in 2012 to clarify the

[2] As discussed below, it is clear from comments the ALJ made later in the decision that he had, in fact, carefully read the Lenert notes.

Agency's position on the difficult task of assessing fibromyalgia claims. SSR 12-2p provided two alternative sets of criteria. The first set includes, as one of three requirements, that there be tender point findings (specifically, 11 out of 18 tender points). However, SSR 12-2p included a second set of criteria that notably omitted this requirement, allowing a claimant to substantiate a diagnosis with other evidence. Plaintiff argues that her case qualifies under this second set of criteria. Without now deciding whether plaintiff meets this second set of criteria, which is an issue that the parties have not adequately briefed and one which should be addressed in the first instance by the ALJ, this Court agrees that the ALJ erred in failing to consider this second set of criteria. This failure requires a remand.

The Government does not directly respond to plaintiff's argument about tender point findings. Instead, the Government argues that the Step Two finding was merely a threshold issue, and that the ALJ, in the later RFC analysis at Step Four, "considered [plaintiff's] reported pain complaints throughout her body." Dkt. #11 at 5. This argument builds off the statements the ALJ made at the end of the fibromyalgia paragraph. The gist of this argument is that the particular cause of plaintiff's problems—whether it be fibromyalgia, osteoarthritis, mental problems, or some combination thereof—was not important because the ALJ validly concluded that plaintiff's pain allegations were not credible. Essentially, this is a harmless error argument. *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010) (the harmless error doctrine applies when the court can conclude with certainty that the ALJ would reach the same conclusion absent the error).

The Court is not certain this error was harmless. The ALJ's belief that plaintiff did not have fibromyalgia could have affected the ALJ's subsequent analysis about what medical findings and specific treatments were relevant, and also about what daily activities plaintiff could be expected to engage in, all of which in turn could have affected how the ALJ assessed plaintiff's credibility. To

understand why this is so, it will be helpful to return to Dr. Lenert's notes and consider them in more detail. Of particular relevance is the "Plan" section at the end of these notes. It states as follows:

Arthralgias:
No evidence of inflammatory arthritis on exam, blood work does not show evidence of inflammation. Has musculoskeletal pain likely secondary to fibromyalgia[.]

Fibromyalgia:
We spent some time discussing the nature of fibromyalgia, that this is a disorder of abnormal pain regulation by the central nervous system, not a disorder of the joints or muscles themselves, and not an inflammatory or "rheumatic" disorder. It is more a "result" than a "cause." There may be a genetic predisposition. People end up with fibromyalgia for a number of reasons but the strongest known associations are chronic non-restorative sleep and mood disorders. Treatment is aimed at treating the underlying problems, and using medications that affect the pain threshold. [Fibromyalgia] does not typically respond to pain medications. Key to getting better is to sleep at night and move the body in the daytime. We agree with continuing amitriptyline as it helps you sleep better. You can take cymbalta if it helps you with musculoskeletal pain symptoms. Recommend aerobic low impact exercises, yoga, tai chi, water based exercises swimming. We do not recommend narcotics or opioids for fibromyalgia as they alter pain perception and over time tend to make your symptoms worse.

R. 603.

This passage is relevant to several reasons the ALJ gave for finding plaintiff lacked credibility. First, the ALJ repeatedly stated that plaintiff only received routine or conservative treatment for her problems and specifically that she was "not on any narcotic pain medications," even though the ALJ acknowledged that plaintiff was still taking numerous non-narcotic medications. R. 46. The problem with this rationale is that it runs directly counter to Dr. Lenert's specific advice to avoid narcotic medications because they would make fibromyalgia symptoms worse in the long run. It seems unfair to criticize plaintiff for following her doctor's advice even if one could somehow argue that this advice was wrong. (And there is no evidence in the record that the advice was incorrect.)

Second, the ALJ repeatedly noted that plaintiff was told to exercise, suggesting that this undercut her allegations. But here again, plaintiff was following Dr. Lenert's specific advice to engage

in "low impact" exercise to try to help her fibromyalgia. The ALJ's conclusion that she did not have fibromyalgia may have caused him to view these exercise efforts in a different light.

Third, and most significantly, the ALJ placed great weight on the fact that there were unremarkable objective findings made during some of plaintiff's doctor visits. *See* R. 42-43 ("the objective clinical exam findings were unremarkable or do not support her extensive functional limitations with any of the treating sources"). Notably, some of these findings were made by Dr. Lenert at the August 8, 2012 visit. The ALJ described and relied on some of these observations. The ALJ noted that plaintiff had "no joint swelling, tenderness or excessive warmth;" that she "had no range of motion abnormalities;" and that she "did not have evidence of inflammatory arthritis." R. 43. These facts were all picked out from Dr. Lenert's notes. Significantly, however, the ALJ did not acknowledge that Dr. Lenert, the same person who recorded these findings, *still* diagnosed plaintiff with fibromyalgia. In other words, contrary to the ALJ's suggestion, Dr. Lenert did not find that these particular unremarkable findings precluded a diagnosis of fibromyalgia nor that they were inconsistent with plaintiff's pain allegations.[3] In fact, Dr. Lenert indicated that plaintiff "[h]as musculoskeletal pain." R. 603. The ALJ's failure to even acknowledge that Dr. Lenert had diagnosed plaintiff with fibromyalgia was not because the diagnosis was a minor one buried in these notes. The purpose of the consultation was to evaluate possible fibromyalgia and arthralgias. Fibromyalgia was central in these notes. Yet, despite the obvious importance of this evidence, the ALJ omitted this diagnosis while including the lesser diagnosis that plaintiff did not have inflammatory arthritis. This is a classic example of cherry-picking. It is also improper doctor playing. *See Lewis v. Colvin*, No. 14 CV 50195, 2016 U.S. Dist. LEXIS 115969, *11 n. 3 (N.D. Ill. Aug. 30, 2016) (courts, counsel, and ALJs must

---

[3] In general, the lack of objective findings is less probative in diagnosing fibromyalgia than some other conditions. *See Harbin v. Colvin*, 2014 WL 4976614, *5 (N.D. Ill. Oct. 6, 2014) ("Fibromyalgia is diagnosed primarily based on a patient's subjective complaints and the absence of other causes for the complaints."). This is another reason why the initial finding that plaintiff did not have fibromyalgia may have affected the later analysis.

resist the temptation to play doctor). The ALJ essentially disagreed with Dr. Lenert's fibromyalgia diagnosis and constructed an alternative diagnosis that plaintiff did not have fibromyalgia. This was a layperson diagnosis because there were no medical opinions supporting the ALJ's theory. Critically, the ALJ did not call an impartial medical expert at the hearing. *Chavez v. Colvin*, CV 12-1771, 2014 U.S. Dist. LEXIS 45568, *10 (C.D. Cal. Mar. 31, 2014); *Stokes v. Astrue*, 09 CV 972, 2010 U.S. Dist. LEXIS 86746, *18 (S.D. Ind. Aug. 23, 2010) (due to the nature of fibromyalgia a medical expert would be a benefit). On remand, the ALJ will obtain a medical expert on this issue. HALLEX I-2_5-34(A)(1).

In sum, the Court finds that the ALJ did not properly and fully consider plaintiff's fibromyalgia. To the extent that the ALJ was uncertain about plaintiff's fibromyalgia, he should have followed the guidance of SSR 12-2p, which states that the Agency "will make every reasonable effort to obtain all available, relevant evidence to ensure appropriate and thorough evaluation," including seeking a consultative examination. At this point, the Court is not indicating that any particular result should be reached on remand. It may be that, after a careful consideration of all the relevant evidence, the ALJ will be justified in finding that plaintiff's fibromyalgia was either not adequately documented or that, if it were, that it would not prevent her from working. The Court notes that SSR 12-2p indicates that an important factor in assessing a claim of fibromyalgia is the claimant's condition over an extended period. Here, it appears that plaintiff only saw Dr. Lenert one time. Therefore, on remand, the entire longitudinal record should be considered.

Having concluded that a remand is warranted based on this first argument, the Court will comment briefly on plaintiff's remaining arguments which are shorter and, in many respects, subject to the same general criticisms already discussed.

**Activities of Daily Living.** Plaintiff complains that the ALJ interpreted her daily activities in a one-sided, black-and-white manner. This Court agrees. The ALJ placed much weight on this rationale, mentioning it repeatedly. Here is one such statement:

> She is capable of doing basic activities of daily living. She drives, shops, and goes to kid's activities. She reportedly cooks, cleans the bathroom, does laundry and empties [the] dishwasher. She reportedly even does some pulling weeds. She watches television and plays games on computer. She rides [her] bike as her mode of transportation in 2015 and she goes to the library.

R. 40 (citations omitted). However, the ALJ engaged in cherry-picking by stripping out and "ignor[ing] [plaintiff's ] numerous qualifications" set forth on the same reports the ALJ relied on. *See Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009). The ALJ also made no findings made about the frequency and nature of these activities: were they sporadic and infrequent or regular and substantial?

In short, the ALJ portrayed plaintiff as a robust individual who had no problems in daily activities. However, plaintiff made numerous statements indicating that she had trouble doing even basic activities. *See, e.g.,* R. 439 ("I have a hard time getting my legs into pants."); R. 440 (in preparing meals, she "limit[s] anything that requires cutting of foods or flipping"); R. 443 ("I don't go to places with my children or boyfriend, like swimming"); R. 459 ("I can't sit, stand, or walk for periods of time. It hurts to do so."); R. 460 ("My arms get tired while washing and drying my hair."). Plaintiff's then boyfriend, Ian Austin, submitted a function report, which the ALJ also discussed in a one-sided way, omitting statements favorable to plaintiff. *See, e.g.,* R. 420 ("Katie experiences severe joint pain and nerve pain"); R. 421 (plaintiff can complete various tasks "but exhibits noticeable pain and difficulty doing them"); *id.* (she does many household activities only "a few times" a week); R. 422 (she can do "limited tending to flower beds").

As for childcaring, the ALJ mentioned several times that plaintiff was taking care of "her minor children." *See, e.g.*, R. 40. But the ALJ failed to note the specific ages of these children. They were 13

and 16 years old at the time of the hearing. R. 81. The ALJ's description gives the impression that plaintiff was caring for toddlers, who typically require more demanding parental involvement, at least in physical terms.[4] Plaintiff's boyfriend noted that plaintiff rarely went anywhere alone without at least one of her children, which suggests they may have helped take care of their mother as much as she was taking care of them. R. 424. In any event, the ALJ failed acknowledge the Seventh Circuit's warnings about placing too much weight on a claimant's ability to care for her children. *See Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005) (the ALJ failed to acknowledge that the claimant "*must* take care of her children, or else abandon them to foster care or perhaps her sister, and the choice may impel her to heroic efforts") (emphasis in original). Also, unlike with work activities, a claimant often can perform household activities under a more flexible standard and then these activities are typically judged by a lower standard of performance. *See Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) (the "failure to recognize these differences is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases."). On remand, the ALJ should consider these factors in assessing plaintiff's daily activities.

**Concentration and Simple Tasks.** Plaintiff argues that the pain from her multiple impairments "distracts her and prevents her from focusing on what is going on around her." Dkt. #10 at 9. She notes that the ALJ found that she had moderate limitations in concentration, persistence or pace, but argues that the ALJ failed to account for them in the RFC. The ALJ did include a limitation to account for them, specifically limiting plaintiff to "simple work related decisions and simple tasks that are defined svp 1 or 2 jobs."[5] R. 49. However, relying on Seventh Circuit case law, plaintiff argues that whether work is skilled or unskilled is "unrelated to the question of whether an individual with [] difficulties in maintaining concentration, persistence, or pace [] can perform such work." *Varga v. Colvin*, 794 F.3d

---

[4] When plaintiff indicated at the hearing that her children were 13 and 16, the ALJ commented that" "they're like a little bit older" and that "[h]opefully, they'll be able to do some stuff." R. 81.
[5] SVP refers to specific vocational preparation, and it is the time needed to learn the skills for particular jobs. SSR 00-4p.

809, 814 (7th Cir. 2015); *see also Lanigan v. Berryhill*, 2017 WL 3172428, *6 (7th Cir. July 31, 2017) ("We have explained that the speed at which work can be learned is unrelated to whether a person with mental impairments—i.e., difficulties maintaining concentration, persistence, or pace—can perform such work."). This Court agrees with plaintiff's argument and the case law supporting it. On remand, the ALJ should address this issue specifically and provide more clarification.

**Work History.** Plaintiff complains that the ALJ wrongly discredited plaintiff's credibility based on the fact that she quit her job and moved to Iowa. At issue was the reason why she moved. Plaintiff offered two rationales. She stated that she moved to Iowa to be with a new boyfriend; at the same time, she stated that her physical and mental impairments were making her unable to adequately do her job. She offered evidence form her supervisor, Jennifer Porrata, who confirmed that plaintiff required help from other employees, that she was assigned fewer tasks, and that she was still only able to do 60% of the required work. R. 395, 430-31.

The Court is not entirely clear on how the ALJ assessed these two co-existing rationales. Earlier in the opinion, the ALJ summarized them both, but later in the analysis of plaintiff's credibility, the ALJ omitted the issue of only being 60% productive in her job.  The ALJ stated as follows: "The claimant's job ended once she decided to move to Iowa, out of state, to live with her boyfriend (Exhibit 1F/20). Accordingly, her job ended due to a move and *not from her medical conditions*."  R. 46 (emphasis added). The ALJ has not provided an adequate explanation for the latter assertion.  On its face, plaintiff's dual explanation is not illogical or contradictory, as the ALJ insinuated. On remand, the ALJ should address these issues (and the specific evidence from Ms. Porrata) more directly and explicitly if the ALJ intends to rely on this rationale.

## CONCLUSION

For these reasons, plaintiff's motion for summary judgment is granted, the Government's motion is denied, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

Date:  August 29, 2017                    By:  _____
                                               Iain D. Johnston
                                               United States Magistrate Judge